## Rockledge Borough's Annexation.

*Boroughs — Annexation — Petition — Improper form of petition—Act of July 11, 1923—Constitutional law.*

1. A petition under the Act of July 11, 1923, P. L. 1030, to annex a borough to a city is improper in form and will be dismissed where it appears that the petition had been prepared in numerous multigraphed copies, that these were circulated for the necessary signatures of voters, that, after the signatures had been obtained to the various copies, such signatures were separated from the copies and attached to another copy which had not been circulated, and thereafter an affidavit was made to the compiled petition by one of the interested parties as to the genuineness of the signatures.

2. Not decided, whether the Act of July 11, 1923, P. L. 1030, repealed by the Act of May 13, 1925, P. L. 679, was unconstitutional.

Petition to change county boundary-lines. Q. S. Montgomery Co., Application No. 321.

*Philip Sterling* and *High, Dettra & Swartz,* for petitioners.

*H. M. & R. J. Brownback,* for remonstrants.

MILLER, P. J., Jan. 18, 1926.—So long ago as June 2, 1924, there was presented to this court that which purported to be a petition under the Act of July 11, 1923, P. L. 1030, expresssly praying for the annexation of the Borough of Rockledge to Philadelphia County.

The application met with the opposition of the City and County of Philadelphia, the County of Montgomery and sundry qualified electors and owners of real estate in Rockledge, all of whom filed answers and earnestly objected to its being granted.

At the first hearing on May 18, 1925, it was represented that both the City and the County of Philadelphia had changed their attitude and desired to file a joint amended answer to that effect. Such was never done, however.

The matter was in due course heard and afterwards argued by counsel.

The questions involved are as follows:

1. Is the paper that was presented on June 2, 1924, a petition within the meaning of the act?

2. Is, or is not, the Act of July 11, 1923, P. L. 1030, constitutional?

3. Was the petition signed by not less than two-thirds of the qualified electors of Rockledge?

4. Was the petition signed by not less than two-thirds in number and interest of the owners of real estate in that borough?

5. Was the genuineness of the signatures subscribed to the petition verified by a qualified elector of the county? and

6. Is it to the best interests of the inhabitants of Rockledge for it to be annexed to Philadelphia?

These questions should be considered in the order in which they are set forth. If, and as soon as, a negative conclusion is reached as to any of them, it is fatal to the whole proceeding.

1. Is the paper that was presented on June 2, 1924, a petition within the meaning of the act? A valid petition is, of course, absolutely essential to give the court jurisdiction. It serves as the very foundation of the whole proceeding.

Certain citizens of Rockledge, having satisfied themselves that it was desirable to have the borough detached from Montgomery County and attached to Philadelphia, were, of course, aware that there was no law then in existence whereby the same could be accomplished. They knew that its area did not

exceed 250 acres and that its population was less than 2000. Their counsel was a member of the legislature.

Remarkable as it may appear to the unsophisticated, the legislature, at its ensuing 1923 session, passed that which purports on its face to be a general act, but which fits exactly this particular case, and it obtained the approval of the Governor. The most serious difficulty in the way of the citizens active in the movement was believed, thus accommodatingly, to have been removed. The next step in regular course was to have prepared and presented to the court the petition designated by the act, and this involved its circulation for signatures. This was no easy task. It had to be signed by not less than two-thirds of the qualified electors of, and the same proportion in number and interest of the owners of real estate in, the Borough of Rockledge. Quite reasonably, it was sought to simplify and systematize this work.

Counsel prepared a typewritten petition, which covered in full three pages, and from it about 100 copies were printed by a multigraphing process. To each copy was then temporarily attached a number of blank sheets of paper. Those actively in charge of the movement had appointed eight captains, under each of whom there were five canvassers, and copies of the petition were distributed amongst them for the purpose of obtaining the necessary signatures.

When this had been done, all were returned to counsel. He then removed from each copy the attached sheets bearing the subscribed signatures and fastened permanently all of these to another multigraphed copy of the petition, which had not been circulated at all, destroying all the copies to which names had been subscribed. One of the subscribers then, by affidavit on a separate sheet, verified the genuineness of the signatures, and the whole, when assembled and backed, was presented to court as the "petition" under the act. There is not, and, in view of counsel's well-known character and professional standing, there cannot be, even an insinuation—let alone a charge—of fraud or that he acted otherwise than honorably. The signatures attached to the document before the court are genuine, and it is not denied that the copies to which these signatures had been attached originally were precisely similar to that now before us. These are not the contentions of the remonstrants. They assert only that, under the testimony, none of the persons whose names are found attached to the document before us ever actually signed it at all—in other words, that it was never signed by any one. The petitioners contend only that, as the subscribers had all signed exact copies of the document filed, no harm was done by assembling their signatures in the manner stated and that the requirements of the law have been sufficiently complied with.

Neither side has directed our attention to any reported Pennsylvania case that throws light on the interesting question involved, and we, in our independent search, have been unsuccessful in finding such. Reliance in disposing of it must, therefore, be placed on the reasoning of cases from foreign jurisdictions, and it must not be forgotten that this is not a case in which a number of complete and precisely similar petitions have, without mutilation, been assembled, backed or fastened together and then filed as a single document, to which no reasonable objection could be urged: Smith et al. v. Patton et al., 45 S. W. Repr. 459. It is, to the contrary, one in which the petitions were mutilated in the process of assembling. It is on this fact of mutilation that the distinction in the cases appears to depend.

Adams v. Woods, 19 Manitoba Reps. 285, is an illustration of the latter class. There, the petition to the municipal council for an election for the adoption of a local option by-law had fourteen signatures subscribed to it. Another sheet, bearing signatures, had been gummed to its bottom; to this,

in turn, had been gummed another such sheet, and so on, all the sheets being thus gummed together and making one continuous whole. At the top of each of such sheets so gummed on there had been originally some printed matter. The court assumed that this printed matter had been identical with that at the top of the first sheet, but noted that, in pasting these on, the printed matter had been cut off, mutilated and destroyed, so that this fact could not be established without oral evidence. It found also that the signatures had been obtained to the several sheets, and, as it was thought more convenient to gum them together, it was then that the mutilation had taken place. The fourteen names subscribed to the original petition were not sufficient to justify the council in ordering the desired election. The matter came before the court on a motion to restrain.

The lower court, in answer to its own query—Has a petition been filed in this case?—said, in part: "Here, the prayer to which most of the subscribing electors attached their signatures was not filed, but, in lieu thereof, what was said to be a copy. Whether it is or is not a copy depends upon parol evidence. While it may be quite certain that, in the circumstances of the present case, no actual wrong would be done by treating this document as sufficient, it would be extremely perilous to create a precedent which would open the doors to frauds of the most dangerous kind—frauds which affidavits of apparently reputable witnesses might successfully cover up. The courts cannot be too careful to discourage the alteration or mutilation of documents." It held that the document presented to council was not a petition within the meaning of the act, and a restraining order was allowed. An appeal from its judgment was dismissed. Hatch v. Rothwell, 19 Manitoba Reps. 465, and Larkin v. Polson, 19 Manitoba Reps. 612, are to the same effect.

A petition, in the most general acceptation of the word, means a formal request, written or printed, and signed by one or many, to be submitted to a person in authority, or to an administrative, a judicial, of a legislative body for the bestowal of some benefit or privilege, the concession or restoration of a right, the redress of a grievance, the establishment of a status, or the exercise of any power within the purview of the person or body to which it is submitted. In law, its meaning is in nowise different, in that it is a formal application in writing, made by the signers thereto to a court, requesting judicial action concerning some matter therein set forth. The use of the word "petition," therefore, means such an application or request as is contemplated by these definitions, and it cannot, under any reasonable interpretation, be otherwise understood by any one familiar with the use of ordinary English words: State v. Imhoff, 238 S. W. Repr. 122, 124.

It is just such a document that the Act of 1923 contemplates when it expressly directs that the petition shall not be considered by the court unless it shall have been "signed" by not less than two-thirds of the qualified electors and, in number and interest, of the owners of real estate within the limits of the district desiring to be transferred.

The difficulty here is, of course, that the document before the court was never signed at all or by any one, let alone by the required proportion of either electors or property owners. We are, therefore, constrained to hold that the court is without jurisdiction to entertain it: Nolting v. Batterton, 83 N. E. Repr. 179; People ex rel. Woodward v. Board of Education, 140 N. E. Repr. 22, 24.

2. The conclusion just reached on the question first propounded is, of course, fatal to the proceeding, and we might—and, no doubt, should—end here. It is, however, deemed advisable to say a few words at this time on the second

one: Is the Act of July 11, 1923, P. L. 1030, constitutional? but without intending to be understood as deciding it.

The act was absolutely repealed, saving pending proceedings, so early as the very next session of the legislature. See Act of May 13, 1925, P. L. 679. It is entitled "An act providing for the alteration of the boundaries of counties in certain cases; for the adjustment of the indebtedness thereof; providing the effect thereof."

One who reads this title will reasonably understand that the purpose of the act is to provide a method for changing county-lines and, if and when such is done, for adjusting the respective indebtedness of the two counties affected. His understanding will, however, be mistaken, because, when he examines the body of the act, he will find that it does not provide for such a proceeding at all. That contemplated is an annexation proceeding, pure and simple, which is a wholly different matter.

A presumption in favor of constitutionality is, of course, raised by the mere fact of the enactment of a statute by the legislature; it is the province of a court to interpret and not to legislate; and courts can declare an act of assembly void only when it violates the Constitution clearly, plainly and in such manner as to leave no doubt or hesitation. The wisdom, justice or expediency of the legislation, or the motives of the legislators, is not for the consideration of the courts: Likens's Petition (No. 1), 223 Pa. 456.

But section 3 of article III of the Constitution requires that the subject of an act shall be clearly expressed in its title, and this must be done so clearly and fully as, when reasonably interpreted, to give notice of the legislative purpose to those who may be specially interested therein. Suggestions or inferences which may be drawn from knowledge *dehors* the language used are not enough. When the title imports one subject, while the act itself shows a different subject to be its real purpose, the title is misleading and the act is unconstitutional: 1 Purdon, 144, and notes.

Moreover, a study of the act suggests other comment upon it. The part of one county to be annexed to another may consist entirely of a single borough, of two or more adjoining boroughs, or parts thereof, of a borough and parts of one or more adjoining townships, of a part of a township of the first class, of a part of a township of the second class, of parts of two or more adjoining townships, and so on *ad infinitum*, so long as the total area does not exceed 250 acres and the entire population 2000 inhabitants.

It makes no provision for notice to any of the boroughs, townships and school districts that may be interested in, and affected by, the proceeding; it gives them no right to appear and be heard; and it contains nothing relating to their indebtedness, if they have any such, or its adjustment, should the application prove successful. It assumes incorrectly that the two interested counties are the only parties to be affected by the contemplated change of boundaries, notwithstanding that the court is required to hear "all parties in interest." It does provide, however, that, in the event of the change, "the property and assets of such local government, or of the school district thereof, shall become the property and assets of the city and the city school district." It is silent on the transfer of records, as it is on the question of the borrowing capacity of either county or how it may be affected by the change. It requires no notice to citizens of the district.

This act, remarkable amongst its class, is so crude, so incomplete, so inaptly expressed and so unworkable generally, that, as stated, it was promptly repealed, but not until after the legislature had, on May 12, 1925, for some reason, sought to replace it by a substantially similar enactment which seems

to differ from the original only in an apparent attempt to safeguard more carefully the rights of the attaching county or city.

The constitutionality of the Act of 1923 is, at the least, debatable, but it is not necessary here to pass upon it. Nor is there, in view of our conclusion as to the first question, occasion to consider, or to comment upon, the four others raised by the pleadings and proofs.

And now, Jan. 18, 1926, the petition is dismissed and its prayer is refused.

From Aaron S. Swartz, Jr., Norristown, Pa.